**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| OTIS B. GRANT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:13-cv-00826-TWP-DML |
| | ) | |
| TRUSTEES OF INDIANA UNIVERSITY, | ) | |
| INDIANA UNIVERSITY, | ) | |
| INDIANA UNIVERSITY SOUTH BEND, | ) | |
| MICHAEL A. MCROBBIE, | ) | |
| UNA MAE CHANCELLOR RECK, and | ) | |
| ALFRED J. GUILLAUME, JR., | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court the Defendants' Motion for Summary Judgment (Filing No. 108). On August 19, 2013, the Plaintiff, Otis B. Grant ("Grant"), filed an Amended Complaint alleging twenty-six claims stemming from his termination from Indiana University South Bend ("IUSB"). (Filing No. 24.) On July 6, 2015, this Court granted in part and denied in part the Defendants' Motion for Partial Dismissal and Judgment on the Pleadings. (Filing No. 128.) Specifically, the Court dismissed claims 8, 11, 12, and 14 as to all Defendants and claims 1-7, 9-10, 13, 17, and 26 against IUSB and for all monetary relief against IUSB President, Michael A. McRobbie ("President McRobbie"), Chancellor Una Mae Reck ("Chancellor Reck"), and Vice Chancellor for Academic Affairs, Alfred J. Guillaume, Jr. ("Guillaume"). Claims were left pending against President McRobbie, Chancellor Reck, and Guillaume in their official capacities for prospective relief. For the reasons stated below, Defendants' Motion for Summary Judgment is **GRANTED**.

# I.  BACKGROUND

The following facts are reviewed in the light most favorable to Grant, the non-moving party, and the Court draws all reasonable inferences in Grant's favor.  *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The Court notes that Grant did not include a substantive fact section in his response brief and rarely cited specific facts in support of his arguments.  Where Grant has cited specific, material facts in his briefing, the Court has included those facts in the following recitation and in the Court's Discussion.  However, as discussed in greater detail below, the failure to provide supporting facts dooms many of Grant's claims.

## A.  Vice Chancellor, Alfred J.  Guillaume, Jr and the Faculty Misconduct Review Committee

Grant is African American.  In May 1999 he was hired by IUSB as an Assistant Professor in the School of Public and Environmental Affairs.  Grant was later granted tenure in the College of Liberal Arts and Sciences and was an award winning tenured faculty member at IUSB for nearly a decade.

In 2008, several students complained to IUSB administrators about Grant, alleging that he allowed a non-employee to grade papers, used offensive language in class, inappropriately cancelled classes and dismissed two students without proper procedure.  (Filing No. 110-6 at 3.)  In response, the Executive  Vice Chancellor of Academic Affairs, Guillaume, assigned Dean Lynn R. Williams ("Dean Williams") to investigate these issues.

The investigation confirmed several of the students' complaints and Dean Williams prepared a letter recommending sanctions.  In the letter, Dean Williams also accused Grant of being "evasive", having "provided false information", and "refus[ing] to provide requested information"

2

during its investigation. (Filing No. 111-3.) Guillaume accepted and implemented Dean Williams' recommended sanctions. In response, Grant filed an informal affirmative action complaint with the University Director of Affirmative Action, alleging that Dean Williams took adverse employment action's against Grant based on racial discrimination. (Filing No. 119-24.) However, Grant did not appeal the sanctions.

In addition to complaining to IUSB's administration, the students also took their complaints to the *South Bend Tribune.* Thereafter, the newspaper submitted several open records requests to IUSB, including two requests regarding Grant's education and training. (Filing No. 110-5 at 3; Filing No. 110-6 at 3.) Because IUSB is subject to Indiana's Access to Public Records Act, Guillaume began gathering records for a response. (Filing No. 110-6 at 3.) In so doing, Guillaume noted discrepancies Grant's employment records.

Guillaume attempted to obtain clarifications from both Grant and the institutions listed in his application materials. However, these exchanges raised even more concerns. For instance, Guillaume noted that Grant changed the name of the judge for whom he clerked, from "Richard M. Wright" to "Richard M. Rittenband". (*cf.* Filing No. 110-15 at 1, Filing No. 111-5 at 7.) In addition, Grant changed the name of the institution from where he received a master's degree from the "Gestalt Institute of Psychology" to the "Gestalt Institute in Liverpool". (*cf.* Filing No. 110-15 at 2, Filing No. 111-5 at 7.) Further, Grant no longer claimed that he was in the doctorate program at Columbia University, contrary to an assertion he made in his letter of application. (*cf.* Filing No. 110-15 at 1; Filing No. 111-4 at 5.)

Guillaume concluded that Grant "misled the university when he applied for a faculty position by falsifying his academic credentials in numerous and significant ways" and had repeated many of the same falsifications throughout his employment. On September 8, 2009,

Guillaume presented his findings to the Faculty Misconduct Review Committee ("FMRC") and recommended that Grant be dismissed for serious misconduct. On October 6, 2009, Grant presented a 47 page response to the FMRC.

On November 4, 2009, the FMRC declined to proceed with a formal hearing. Although the FMRC believed that the issues were "troubling," it viewed the verification of Grant's credentials to be the responsibility of the Search and Screen Committee at the time Grant was hired. (Filing No. 111-8 at 2-3.) Further, the FMRC did not believe a hearing would establish "chronic or substantial incompetence or misconduct" since the charges did not relate to Grant's scholarship, teaching, and service, and noting that a hearing would not likely answer the "serious questions" about events and conduct at the time of hiring. Finally, the FMRC concluded that, even if the allegations against Grant were true, "it cannot be the basis for removal of [Grant's] tenure and dismissal". (Filing No. 111-8 at 2-3.)

Despite the FMRC's recommendation, Guillaume strongly believed the FMRC had reached the wrong decision. (Filing No. 110-6 at 7.) Six months later, on May 10, 2010, Guillaume submitted a recommendation for Grant's dismissal to Chancellor Reck in which he wrote that termination was "appropriate in view of the systemic nature of the misrepresentations and Professor Grant's refusal to acknowledge them." (Filing No. 111-6 at 5). Thereafter, Guillaume had no further involvement in any employment decisions related to Grant.

**B.**     **Chancellor Reck and Klink & Company**

On September 1, 2010, Chancellor Reck met with Grant to discuss the issues raised in Guillaume's recommendation. (Filing No. 110-5 at 3.) Chancellor Reck asked Grant whether he had new documentation to refute Guillaume's findings. (Filing No. 110-5 at 4.) In response, Grant denied all the charges raised the issue of retaliation because of his affirmative action

complaint against Dean Williams; and additionally alleged that Guillaume, who is also an African American, was retaliating against him. *Id.*

Noting the contradiction between Guillaume's findings and Grant's denials, and additionally noting Grant's discrimination assertions, Chancellor Reck informed Grant that she would hire an outside party to verify his credentials and to provide an independent perspective. (Filing No. 110-5 at 4; Filing No. 110-2 at 9.)   On September 10, 2010, Chancellor Reck advised Grant in writing that IUSB had retained Klink & Company ("Klink"), an international consulting and investigative firm, to conduct an independent review of Grant's vita and application materials. (Filing No. 110-5 at 4.)   Klink's founder, Mr. Jeffrey Klink, is a former Assistant United States Attorney.   (Filing No. 110-8 at 90.)   In the interim, Grant provided a 42-page response to Chancellor Reck regarding Guillaume's recommendation for dismissal. (Filing No. 110-5 at 4.) Notably, however, Grant did not include new documentation that would substantiate his credentials.   *Id.*

Five months later, on February 22, 2011, Chancellor Reck received Klink's final report.   (Filing No. 110-5 at 5; Filing No. 110-8.)   Therein, Klink concluded that Grant's claimed credentials were, in many instances, "vague," "misleading," or "otherwise incorrect".   (Filing No. 110-8 at 7.)   In addition, Klink noted that Grant had impeded its investigation by not providing consent to verify all employment and educational credentials.   *Id.*

## C.   Alleged Discrepancies in Grant's Employment Documents

IUSB notes the following discrepancies in Grant's employment documents, either revealed during Klink's investigation or pursuant to this litigation.   Where Grant provided responses with accurate citations to the evidence in his summary judgment briefing, the Court has included those as well.

5

### 1.     **Teaching Experience**

In his 1998 vita, Grant represented the following teaching experience:

1997-1998: California State College, Instructor of Criminal Justice
1997:  Howard University, Lecturer
1997: Armed Forces Institute, Lecturer
1984-1985:  Boston State College, Lecturer

(Filing No. 110-15 at 4.)  Grant stated that he stopped listing this information in 2003.  (Filing No. 111-4 at 4.)

Klink found no evidence to substantiate any of this teaching experience, either as a Lecturer or as a workshop leader teaching courses to contractors.  (Filing No. 110-8 at 12-13, 25.)  Further, Klink could not verify the existence of an Armed Forces Institute.  (Filing No. 110-8 at 25.)  Similarly, it was discovered that Boston State College did not exist in 1984-1985, having merged with the University of Massachusetts at Boston in 1982.  (Filing No. 110-7 at 10; Filing No. 110-8 at 25.)

Grant admitted that he did not actually work for these institutions, claiming, instead, that he taught courses on those campuses in 2-3 day workshops "to train professionals and contractors". (Filing No. 110-1 at 49; Filing No. 110-6 at 5; Filing No. 111-4 at 4.)   In this regard, according to the Defendants' expert in academia, Grant's representation was, at a minimum misleading, noting that "[m]erely giving a lecture or a workshop on a college campus does not make that individual a 'Lecturer'".  (Filing No. 110-7 at 9.)  Instead, according to the expert, "Lecturer" and "Instructor" are terms of art in higher education and signify someone who has teaching experience through employment from a university or college.  *Id*. at 9-10.

### 2.     **Master's Degree**

Also in his 1998 vita, Grant represented that he had a master's degree from the Gestalt Institute of Psychology (Filing No. 110-15).  However, during Guillaume's inquiry, Grant said that

he had received his master's degree from the "Gestalt Institute in Liverpool" and that he had stopped listing the degree in 2004. (Filing No. 110-6 at 4, 6; Filing No. 111-5 at 7.)

Klink could not verify that Grant obtained a master's degree from the Gestalt Institute. Further, Klink was unable to verify that a Gestalt Institute ever existed in Liverpool, England or elsewhere. (Filing No. 110-8 at 9.) During his deposition, Grant later informed that he received his master's degree "on a military base" through a "correspondence course". (Filing No. 110-1 at 45.) However, IUSB notes that Grant has never produced an official diploma, transcript, or other academic record to verify the existence of his master's degree. Instead, Grant stated that he does not have a copy of his master's degree transcript but he believes a copy of the transcript was in IUSB's personnel file. (Filing No. 120-8 at 7.)

### 3.    Doctorate Studies

Grant's 1998 letter of application also stated, "I am presently working towards a Doctorate in Psychology at Columbia University." (Filing No. 110-15 at 1.) Similarly, Grant's 1998 vita represented his enrollment in the Teacher's College at Columbia University. (Filing No. 110-15 at 2.) Grant contends that he never claimed to have been admitted to a doctorate program. (Filing No. 120-8 at 10.) Pursuant to Klink's investigation, Columbia University's records showed that Grant had not taken a class at the school since 1993, and that Grant had not been admitted into a doctoral program at the school. (Filing No. 110-8 at 10, 19.)

### 4.    Fellowships

Mr. Grant's 1998 vita also represented that he received the following fellowships:

1996-1997: Flynn Fellowship, University of Connecticut School of Law
1994-1996: Cohen Fellowship, University of Connecticut School of Law
1992-1993: Goldberg Fellowship, Columbia University
1985-1986: Weinstien Fellowship, Gestalt Institute

(Filing No. 110-15 at 3.)  Grant has since admitted that he did not receive fellowship awards from these institutions.  (Filing No. 110-6 at 5; Filing No. 111-4 at 2.)  Instead, Grant asserts that he had received scholarships from a program administered by Connecticut Senator Alvin Penn.  *Id.*  IUSB notes, however, that Grant's new assertion has also not been verified by documentation.

### 5.   **Judicial Clerkship**

Grant's 1998 letter of application stated, "I was the law clerk to Judge Richard M. Wright." (Filing No. 110-15 at 1.)   Similarly, Grant's 1998 vita represented that he worked for Superior Court Judge Richard M. Wright from 1997-1998.  *Id.* at 4.  IUSB, however, notes a number of discrepancies regarding these representations.

First, Guillaume noted that a contemporaneously filed letter of recommendation was submitted in support of Grant's application by "Superior Court Judge Douglas B. Wright," who identified Grant as his "law clerk".  (Filing No. 110-16.)  Because Grant's vita and letter of application identified Judge *Richard M.* Wright and not Judge *Douglas B.* Wright, Guillaume asked for clarification.  (Filing No. 110-6 at 4.)   In response, Grant said that he had not clerked for Judge Richard M. Wright but instead clerked for Judge Richard M. Rittenband.  *Id.*  However, IUSB points out that a clerkship with Judge Rittenband did not appear on Grant's vita.  (Filing No. 110-15.)

When Klink investigated these discrepancies, it discovered that Judge Wright's name was misspelled in both the letterhead and signature line, noting that the correct spelling of the judge's name included two "s's" ("*Douglass*").  (Filing No. 110-8 at 13-16; Filing No. 110-16).  Having obtained four exemplar signatures, Klink also concluded that the signature on the letter was a forgery.  (Filing No. 110-8 at 14.)  Further, Klink learned that the letterhead used on the letter was not common to the letterhead used by the judges in that particular court.  *Id.*  In addition, Klink

learned that Judge Douglass Wright resigned from the trial bench in 1982, and was on a leave of absence in 1997.  (Filing No. 110-8 at 13.)

Grant responds that he never saw the letter as part of his application and asserts that IUSB may have fraudulently prepared it, noting that the letter was always in IUSB's possession.  (Filing No. 132 at 11.)  Grant also notes that Judge Wright died in 2010, making it impossible to verify the authenticity of the letter.  (Filing No. 132 at 11-12.)

Finally, when Klink asked about Grant's purported work with Judge Richard M. Rittenband, Judge Rittenband claimed that he had no recollection of Grant.  (Filing No. 110-8 at 16.)  Instead, Klink discovered that Grant's service to the court was as a "temporary assistant clerk" rather than a "law clerk", with substantially different responsibilities, such as marking evidence, taking the oath of witnesses, and supervising jurors.  (Filing No. 110-8 at 14-15.)

**6.      Letter of Recommendation**

As part of Grant's 1998 application, IUSB also received a letter of reference from a "C. John Goar, Ph.D." on "Columbia University" letterhead.  (Filing No. 110-17; Filing No. 110-8 at 18.)  In the letter, "Mr. Goar" stated that he was an adjunct professor at both Columbia and Howard University.  (Filing No. 110-17.)  However, Klink could not verify that a person identified as "C. John Goar, Ph.D" ever existed.  (Filing No. 110-8 at 18.)  Indeed, both Columbia and Howard University indicated that they had no record of a Dr. Goar serving as an adjunct professor, and Klink was unable to find a record of a Dr. Goar serving as an adjunct professor at any other university.  (Filing No. 110-8 at 18.)

Grant again responds that he never saw the letter as part of his application and appears to suggest that IUSB may have fraudulently prepared it.  (Filing No. 132 at 11.)  Grant asserts that Dr. Goar died in 2002, making it impossible to verify the authenticity of the letter.)

7.     **Evolving Employment Documents**

Finally, the Defendants also noticed that Grant occasionally changed his employment records in his annual updates to IUSB.  For instance, in an updated version of his vita, IUSB notes that Grant changed his undergraduate minor at Westfield State College from Criminal Justice to Economics.  (Filing No. 111-1 at 2.)

D.     **Chancellor Reck and the Faculty Board of Review**

On March 8, 2011, Chancellor Reck provided the Klink report to Grant and gave him an opportunity to respond.  (Filing No. 110-5 at 5.)  Grant twice requested more time to respond, and each time Chancellor Reck agreed.  *Id.*  Finally, on April 25, 2011, Grant submitted a 43 page response, in which he denied both Klink's findings and the Guillaume's charges.  *Id.*  However, Grant did not provide documents to contradict Klink's findings.  *Id.*  Thereafter, Chancellor Reck attempted again to meet with Grant, to no avail.  *Id.*  Indeed, after July 2011, Chancellor Reck's office tried to communicate with Grant twenty-six times.  (*Id.*; Filing No. 110-2 at 18.)

Finally, on September 13, 2011, Chancellor Reck informed Grant that she found he had "engaged in serious personal and professional misconduct" and that "[m]isconduct of this nature presents a severe threat to the academic integrity and reputation of the University, and therefore is a matter of utmost seriousness for this and any other university."  (Filing No. 110-5 at 5; Filing No. 111-10 at 2.)  As a result, Chancellor Reck informed Grant that he would be dismissed from the faculty, effective December 31, 2011, but that, pursuant to the Indiana University Academic Handbook ("IU Handbook"), he could request a hearing.  (Filing No. 111-10 at 2, 8.)

According to the IU Handbook §§ 1.2.2, 1.2.3.3, 1.2.3.4, and 1.2.4, and as part of the Code of Academic Ethics, academic personnel "accept and adopt the provisions of the *Indiana University Code of Student Rights, Responsibilities, and Conduct* pertaining to personal misconduct on University property".  (Filing No. 110-11 at 16.)  Personal misconduct includes

10

"[d]ishonest conduct including, but not limited to, false accusation of misconduct, forgery, alteration or misuse of any university document, record or identification; and giving to a university official information known to be false". *Id.* at 17.

On September 14, 2011, Grant indicated that he planned to appeal the termination decision. ([Filing No. 110-5 at 6](#).) On September 26, 2011, Chancellor Reck reminded Grant that he should submit an appeal to the Faculty Board of Review "as soon as possible", in order to allow for a hearing before his dismissal date. *Id.* However, Grant waited until December 19, 2011 to submit a 283 page grievance to the Faculty Board of Review. (*Id.*; [Filing No. 111-11](#), [Filing No. 111-12](#).) Nevertheless, the grievance did not provide documentation of credentials to dispute Klink's findings. ([Filing No. 110-4 at 7](#).)

Thereafter, the Faculty Board of Review acquired information from both sides and tried to schedule a hearing with Grant. ([Filing No. 110-5 at 7](#).) On August 1, 2012, the Faculty Board of Review Chair, Dr. Joseph Chaney, confirmed with Grant that he still desired to have a hearing in the case. *Id.* Soon thereafter, IUSB agreed to potential hearing dates, but Grant claimed that he was not available at any of the suggested times. *Id.* However, on August 28, 2012, Grant terminated the Faculty Board of Review process before a hearing was scheduled. (*Id.*; [Filing No. 110-2 at 12](#).)

The decision to terminate Grant was never submitted to the IUSB Senate Promotion, Tenure and Reappointment Committee. After Grants termination effective December 3, notice was President McRobbie was not involved in the termination process. ([Filing No. 110-5 at 7](#).)

## II. <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment,

the court reviews the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Zerante*, 555 F.3d at 584; *Anderson*, 477 U.S. at 255.

The party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion, and identifying "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323 (noting that, when the non-movant has the burden of proof on a substantive issue, specific forms of evidence are not required to negate an non-movant's claims in the movant's summary judgment motion, and that a court may, instead, grant such a motion, "so long as whatever is before the district court demonstrates that the standard . . . is satisfied."). *See also* Fed. R. Civ. P. 56(c)(1)(A) (noting additional forms of evidence used in support or defense of a summary judgment motion, including: "depositions, documents electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials").

At summary judgment, the non-moving may not rest on his pleadings but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires a trial. *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) ("[i]t is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which [it] relies"); S.D. Ind. Local R. 56-1(h) ("[t]he court has no duty to search or consider part of the record not specifically cited").

Indeed, when a non-moving party fails to include a separate factual statement, courts are instructed to treat the movant's version of the facts as uncontested. *See Waldridge v. Am. Hoechst*

*Corp.*, 24 F.3d 918, 922 (7th Cir. 1994); *Childress v. Experian Info. Servs.*, 2014 Lexis 103738, 9-11 (S.D. Ind. 2014) (J. Pratt); S.D. Ind. Local R. 56-1(f) ("[i]n deciding a summary judgment motion, the court will assume that the facts as claimed by admissible evidence by the movant are admitted without controversy except to the extent that the non-movant specifically controverts the facts in that party's "Statement of Material Facts in Dispute" with admissible evidence") (internal citations omitted).

Neither the mere existence of some alleged factual dispute between the parties nor the existence of some "metaphysical doubt" as to the material facts is sufficient to defeat a motion for summary judgment. *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997); *Anderson*, 477 U.S. at 247-48; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Similarly, a court is not permitted to conduct a paper trial on the merits of a claim and may not use summary judgment as a vehicle for resolving factual disputes. *Ritchie v. Glidden Co., ICI Paints World-Grp.*, 242 F.3d 713, 723 (7th Cir. 2001); *Waldridge*, 24 F.3d at 920. Indeed, a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("these are jobs for a factfinder"); *Hemsworth*, 476 F.3d at 490. Instead, when ruling on a summary judgment motion, a court's responsibility is to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial. *Id.*

## III. <u>DISCUSSION</u>

The Defendants begin by arguing that Grant's tort claims, Counts 16-23, are barred for failing to comply with the notice provisions of the Indiana Tort Claims Act ("ITCA"). The

Court will first address the tort claim issue and then proceed with analysis on the twenty-one claims which have survived dismissal and judgment on the pleadings.

**A.**   **Indiana Tort Claims Act Notice**

The ITCA governs tort claims against the State of Indiana, state universities, and their employees. *See* Ind. Code §§ 34-13-3-1, 34-6-2-110(7); *see also Oshinski v. N. Ind. Commuter Transp. Dist.*, 843 N.E.2d 536, 543-44 (Ind. Ct. App. 2006). Observance of the ITCA notice provisions, within 180 days of the alleged loss, is a condition precedent to filing suit. *See Orem v. Ivy Tech State Coll.*, 711 N.E.2d 864, 869 (Ind. Ct. App. 1999) ("[t]he notice provision is not a statute of limitation but a procedural precedent which must be fulfilled before filing suit"); Ind. Code §§ 34-13-3-8; 34-13-3-12. Once a defendant raises the issue of compliance with the ITCA, "the burden shifts to the plaintiff to prove compliance." *Davidson v. Perron*, 716 N.E.2d 29, 34 (Ind. Ct. App. 1999). Indiana courts have held that the failure to comply with the ITCA's notice requirements demands that a case be dismissed. *See Meury v. Eagle-Union Cmty. Sch. Corp.*, 714 N.E.2d 233, 241 (Ind. Ct. App. 1999). Whether a person has complied is a question of law. *See Orem*, 711 N.E.2d at 869; *Meury*, 714 N.E.2d at 241 ("question of compliance is not a question of fact, but rather a procedural precedent which the plaintiff must prove and which the trial court must determine").

Mr. Grant attached a letter to his Amended Complaint which he purportedly delivered to IUSB's Chancellor on December 1, 2011 and to the Indiana Attorney General's Office on December 5, 2011. (Filing No. 24-1.) In addition, on November 18, 2014, Grant submitted two affidavits to the Court in which Grant and his wife affirmed under oath that they "hand-delivered" these notices. (Filing No. 91.) However, Chancellor Reck asserts that IUSB never received a tort claims notice. (Filing No. 110-5 at 7.) Similarly, the Attorney General's Office submitted an

affidavit stating that it, too, had not received the notice.  (Filing No. 110-9.)  In addition, the Defendants argue that there are a number of "revealing anachronisms" in Grant's purported ITCA notice, raising questions whether the documents were actually created and delivered when alleged by Grant.  (Filing No. 109 at 24-25.)

Both parties have submitted competing affidavits to support their positions regarding the purported delivery of Grant's ITCA notice.  While the question of compliance with ITCA notice is a question of law, the underlying issues of authenticity and credibility are factual issues which this Court is not at liberty to resolve.  As a result, fact issues exist that cannot be resolved by motion.  Nevertheless, as discussed in greater detail below, the Court's conclusion regarding Grant's ITCA notice is "academic" because Grant has failed to submit sufficient facts to support his tort claims.

**B.**     **Claim 1:  Section 1981 Race Discrimination**

The framework governing liability under Title VII also applies to § 1981 claims.  *See Paul v. Theda Med. Ctr., Inc.*, 465 F.3d 790, 794 (7th Cir. 2006); *Johnson v. City of Fort Wayne*, 91 F.3d  922, 940 (7th Cir. 1996).   Direct or indirect evidence can be used to prove racial discrimination in an employment setting.  *Paul*, 465 F.3d at 794.  Grant has not presented evidence that would establish a direct finding of intentional discrimination.

Under the *McDonnell Douglas* framework for indirect proof, Grant first must establish a *prima facie* case.  *Id*.  Specifically, a plaintiff must show: (1) he is a member of a protected class; (2) he met the defendant's legitimate job expectations and was qualified for the job; (3) he experienced an adverse employment action; and (4)  similarly situated employees outside of his protected class were treated more favorably.  *Id*.  Thereafter, if the defendant submits a legitimate, nondiscriminatory reason for the adverse employment action, the plaintiff must also submit

sufficient evidence to demonstrate that the defendant's purported justification for its action was pretextual. *Id.*; *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012).

Grant is a member of a protected class and his termination is an adverse employment action. However, Grant cites no evidence of a similarly situated employee outside of his protected class who was accused of misconduct because of allegedly submitting false credentials to IUSB and who was not similarly terminated by the Defendants. As a result, Grant cannot establish a *prima facie* case of race discrimination. *Paul*, 465 F.3d at 794. In addition, even assuming that Grant could establish a *prima facie* case, he has cited no evidence to support his assertion that the Defendants' stated reason for terminating his employment, misconduct due to allegedly submitting false credentials, was pretextual. Instead, Grant merely asserts, without identifying any evidentiary support in the record, the following:

> Given the documentation in her possession, Chancellor Reck's explanation and decision to terminate [Grant] is unworthy of credibility. Because Chancellor Reck had no reason to believe that the conduct she attributed to [Grant] was worthy of termination, and that her statements regarding her reliance on Defendant Guillaume and Klink was true, but she nevertheless acted on it, her conduct can be interpreted as pretextual.

(Filing No. 118 at 17.)

At summary judgment, Grant may not rest on his pleadings but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial. *Hemsworth*, 476 F.3d at 490; *Celotex Corp.*, 477 U.S. at 323-24; Fed. R. Civ. P. 56(c)(1). This is particularly true, given the deference courts give to the administrative decisions regarding professional misconduct at universities. *See, e.g.*, *Collins v. Univ. of Notre Dame*, No. 3:10-CV-281 JVB, 2012 WL 1877682, at *4 (N.D. Ind. May 21, 2012) ("in reviewing [a university's] actions regarding tenured professors, the courts are reluctant to second-guess the administrative decisions"); *Vanasco v. National-Louis Univ.*, 137 F.3d 962, 968 (7th Cir. 1998)

("we must not second-guess the expert decisions of faculty committees in the absence of evidence that those decisions mask actual but unarticulated reasons for the University's action"); *Lim v. Trs. of Ind. Univ.*, No. IP-99-0419-C-M/S, 2001 WL 1912634, at *21 (S.D. Ind. Dec. 4, 2001) (noting that the court "does not sit as a super-personnel manager").  *See also Williams v. Boorstin*, 663 F.2d 109, 117-18 (D.C. Cir. 1980) (concluding that there was no race discrimination given the "formidable record of lying" about the employee's credentials).  Having failed to submit any evidence to support his racial discrimination claim, summary judgment is warranted.

**C.**    **Claims 2 and 3: Retaliation under 42 U.S.C. §§ 1981, 1983**

Grant also failed to identify facts in support of his retaliation claims.  To establish a retaliation claim under § 1981, Grant must present evidence of: (1) a statutorily protected activity; (2) a materially adverse action; and (3) a causal connection between the two.  *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 404 (7th Cir. 2007).  To establish a retaliation claim under § 1983, Grant must demonstrate that: (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter future First Amendment activity; and (3) the First Amendment activity was at least a motivating factor in the allegedly retaliatory decision.  *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012).

Grant filed an informal complaint in 2008 against Dean Williams after Dean Williams recommended sanctions against him.  (Filing No. 110-6 at ¶ 17.)  Grant also made numerous informal complaints against Guillaume.  However, Chancellor Reck made the decision to terminate Grant, not Dean Williams.  In addition, Dean Williams was not involved in the process once the matter was assigned to Chancellor Reck.  (Filing No. 110-5 at ¶ 20.)  Similarly, Guillaume was not involved in the decision-making process after he submitted his recommendation letter to

Chancellor Reck.   (Filing No. 110-5 at ¶ 20.)  Further, Chancellor Reck based her decision on Klink's third-party investigation.  (Filing No. 110-5 at 4-5; Filing No. 110-2 at 9.)

While Grant does not appear to assert that Chancellor Reck had a discriminatory motivation, (see Filing No. 118 at 14), he asserts that Chancellor Reck may have been manipulated by the discriminatory animus of Guillaume, under a "cat's paw" theory of liability.  *See, e.g., Cook v. I.P.C. Int'l Corp.*, 673 F.3d 625, 628 (7th Cir. 2012) ("the "cat's paw" metaphor refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action").  However, Grant cites no evidence of any retaliatory animus that may have manipulated Chancellor Reck's termination decision and there is nothing in Guillaume's recommendation letter that reflects any racial animus in the termination decision. Grant supports his argument solely with his own subjective opinions, and identifies no objective facts to suggest that a discriminatory motive actually existed.  Instead, Grant only asserts, "[i]f [Grant] can raise a genuine issue about Defendant Chancellor Reck's honesty, not merely the accuracy of her stated assertion, the case may need to be tried".  (Filing No. 118 at 14.)

As the non-movant, Grant has the burden to present specific facts to support his claim in response to a summary judgment motion; and he cannot wait until trial to submit such facts.  *See Mills v. First Fed. Sav. & Loan Assoc. of Belvidere*, 83 F.3d 833, 841-42 (7th Cir. 1996) ("subjective beliefs of the plaintiff are insufficient to create a genuine issue of material fact") (internal punctuation omitted); *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892 (7th Cir. 2003) ("summary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that will convince a trier of fact to accept its version of events") (internal punctuation

omitted).  Accordingly, having failed to identify any facts to support his retaliation claims, summary judgment is warranted as to these claims.

**D.    Claims 4 and 5:  Procedural Due Process**

Grant devotes a significant portion of his briefing to the argument that he was denied federally protected due process rights because IUSB did not follow the procedures within the IU Handbook.  However, the Seventh Circuit has repeatedly held that a state-created university process does not confer federal due process rights.  *See Osteen v. Henley*, 13 F.3d 221, 225 (7th Cir. 1993) ("a violation of state law [including university judicial code] is not a denial of due process, even if the state law confers a procedural right"); *Charleston v. Bd. of Trs. of Univ. of Illinois at Chi.*, 741 F.3d 769, 773 (7th Cir. 2013) ("[w]e have rejected similar claims of an interest in contractually-guaranteed university process many times, but we will be clear once more: a plaintiff does not have a federal constitutional right to state-mandated process") (internal citations omitted); *de Llano v. Berglund*, 282 F.3d 1031, 1035 (8th Cir. 2002) ("federal law, not state law or [university] policy, determines what constitutes adequate  procedural due process").  Instead, constitutional due process is concerned with procedural protections informed by federal law and not state university policies.  *Id.*

Further, even assuming that Grant had a protectable property interest as a tenured professor, he has not submitted sufficient evidence to suggest that he received inadequate process pursuant to his termination at IUSB.  While the parties dispute whether IUSB followed the proper procedures when deciding to terminate Grant's employment[1], in the almost four years between the initial

---

[1] For instance, the Defendants assert that they followed the Indiana University Academic Handbook provision related "Violation of Academic Ethics" which states that "[t]he line of administrative action in cases of alleged violation of academic ethics" includes the Vice Chancellor and Chancellor, and that "sanctions appropriate to the offense should be applied by the academic administrators", including "termination of employment" and "immediate dismissal." (Filing No. 110-11 at 18.)  Further, the Defendants assert that, when such sanctions have been imposed, faculty "shall have such rights as are provided by the rules governing appeals to the Faculty Board of Review".  (*Id.*) (*See also* Filing No. 119-1 at 20-21, 22-23) (noting that dismissal actions for "serious and professional misconduct" proceed

investigation and his termination of his Faculty Board of Review appeal, Grant at all times received notice of the charges against him and had multiple opportunities to be heard.  Indeed, Grant cites at least eight responses he made to IUSB throughout its investigation of his academic credentials.  (*See* Filing No. 132 at 12-13.)  This is in addition to the numerous formal and informal meetings that Grant had with Guillaume, the FMRC, Chancellor Reck, and the Faculty Board of Review along the way.  In this regard, Grant has submitted no evidence to the contrary.

Nevertheless, Grant argues that he should have been afforded specific procedures that conform to his interpretation of the IU Handbook.  However, this is not the relevant inquiry, as Grant asserts a *constitutional* due process claim.  The  essential  requirements of a constitutional due process claim are notice and an opportunity to respond.  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545-46 (1985) (evaluating the pre-termination process provided to a tenured public employee). The employee "is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id*. (noting that the opportunity to be heard "need not be elaborate").  Further, "in the context of educational institutions, as long as the process is reasonably transparent and fair and affords the subject an opportunity to respond … the ultimate issue focuses less on the particular process and more on the recognition of the institution's interest in assuring a proper educational environment."

---

through the FMRC.)  In addition, the Defendants contend that Grant waived his appeal when he terminated the Faculty Board of Review proceedings. *See, e.g.*, *Cliff v. Bd. of Sch. Comm'rs of Indianapolis, Ind.*, 42 F.3d 403, 413-14 (7th Cir.  1994) (holding that a public school teacher waived her due process claim by waiving her right to a pre-termination hearing); *Fern v. Thorp Pub. Sch.*, 532 F.2d 1120, 1131-32 (7th Cir. 1976) (holding that a teacher could not assert a procedural due process claim after failing to take advantage of hearing).

In contrast, Grant argues that, based on the Indiana University Academic Handbook, the Defendants should have been bound by the FMRC's recommendation not to proceed with a formal hearing regarding the allegations against him.  (Filing No. 119-1 at 22-23, 26-27) (noting FMRC recommendation procedures.)  In addition, Grant contends that, based on the Indiana University Academic Handbook, the termination decision should have proceeded through the Promotion, Tenure and Reappointment Committee.  (Filing No. 119-1 at 20.)  Finally, Grant argues that the Faculty Review Board appeal was deficient, in part, because it could only make a recommendation to reinstate his employment and could not directly overrule Reck's decision to terminate his employment.  (Filing No. 119-9 at 30-31; Filing No. 119-11 at 2.)

*Hartman v. Keri*,  883 N.E.2d 774, 777-78 (Ind.  2008); *see also Haegert v. Univ. of Evansville*,
977 N.E.2d 924, 951 (Ind.  2012);  *Barszcz v. Bd. of Trs. of Cmty. Coll. District No. 504*, 400 F.
Supp. 675, 678 (N.D. Ill. 1975) (holding that a tenured professor was not entitled to a pre-
termination hearing on account of misrepresentations regarding his master's degree and the
"demoralizing effect" it had on his associates).

Given the length of time that IUSB took to investigate the claims against Grant, the
numerous meetings that IUSB had with Grant to determine the facts behind the allegations, and the
frequent opportunities that were afforded to Grant to respond to the allegations against him, no
reasonable jury could conclude that Grant was not afforded his *constitutional* procedural due
process rights of notice and the opportunity to be heard.   Accordingly, summary judgment is
warranted on these claims as well.

**E.**     **Claims 6 and 7: Substantive Due Process**

Grant presented no facts or arguments in support of his substantive due process claims.
When a substantive due process claim is "predicated on the deprivation of a state-created property
interest," such as a contract, the plaintiff must show: (1) that the state actor's conduct was arbitrary
and  irrational; and (2) that the state actor committed a separate constitutional violation or that
state law remedies are inadequate. *Galdikas v. Fagan*, 342 F.3d 684, 691 (7th Cir. 2003).  "[O]nly
the most egregious official conduct can be said to be arbitrary in the constitutional sense."  *Cty. of
Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998) (noting that such conduct must "shock the
conscience").   Having failed to submit any facts or argument in support of his substantive due
process claims, summary judgment is warranted on these claims as well.

**F.**     **Claims 9 and 10: Conspiracy to Interfere with Civil Rights under 42 U.S.C. §§ 1985,
1986**

Grant similarly identified no facts to support his conspiracy claims.   To establish a conspiracy claim under Section 1985, he must prove a "conspiracy" to deprive him of equal protection of the laws based on some "racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267-68 (1993); *Majeske v. Fraternal Order of Police, Local Lodge No. 7*, 94 F.3d 307, 311 (7th Cir. 1996); *see also* 42 U.S.C. § 1985.  In addition, Grant must demonstrate "that the conspirators ha[d] an agreement to inflict injury or harm upon him" and must show that the conspirators acted "with a single plan, the general nature and scope of which [was] known to each would-be conspirator." *Hernandez v.  Joliet Police Dep't*, 197 F.3d 256, 263 (7th Cir.  1999).

Grant has failed to submit evidence of either a conspiracy or a discriminatory animus. Instead, Grant argues his subjective belief that the Defendants conspired to violate university procedures to terminate his employment.  However, Grant submits no specific facts to justify his belief that a conspiracy actually existed.  *See Mills*, 83 F.3d at 841-42 ("subjective beliefs of the plaintiff are insufficient to create a genuine issue of material fact").  In contrast, the Defendants submitted specific evidence to show that Chancellor Reck removed Guillaume from the decision making process and hired a third-party investigator to evaluate the claims against Grant, separating even herself from the information-gathering process.  (Filing No. 110-5 at 4; Filing No. 110-2 at 9.)  Further, Grant identifies no facts whatsoever to suggest that any of the Defendants were motivated by a racial or other "class-based" animus in investigating Grant's credentials or terminating his employment.  Accordingly, summary judgment is warranted on these claims as well.

**G.**   **Claim 13: Equal Protection under 42 U.S.C. § 1983**

Grant also presented no facts or arguments in support of his equal protection claim.  "The equal protection clause of the Fourteenth Amendment protects individuals against intentional,

22

arbitrary discrimination by government officials." *Hayden v. Greensburg Cmty. Sch. Corp.*, 743 F.3d 569, 577 (7th Cir. 2014). Because an equal protection claim requires the same evidentiary proof as a Section 1981 discrimination claim, establishing discrimination under either the direct or indirect method of proof, Grant's equal protection claim fails for the same reasons his Section 1981 racial discrimination claim fails. *See*, *e.g.*, *Adams v. City of Indianapolis*, 742 F.3d 720, 725, 735 (7th Cir. 2014) (requiring proof of discrimination under either the direct or the indirect, *McDonnell Douglas*, methods). Potentially recognizing this burden, Grant did not present any facts or argument in support of this claim. Accordingly, summary judgment is warranted on this claim.

## H.   Claim 15: Promissory Estoppel

Grant has not submitted sufficient facts to support his promissory estoppel claim. To establish a promissory estoppel claim, a plaintiff must show: (1) a promise by the promissor; (2) made with the expectation that the promise will rely thereon; (3) which induces reasonable reliance by the promisee; (4) of a definite and substantial nature; and (5) injustice can be avoided only by enforcement of the promise. *Biddle v. BAA Indianapolis, LLC*, 860 N.E.2d 570, 581 (Ind. 2007).

Grant has not demonstrated sufficient evidence that the IU Handbook made promises with the expectation of reliance. Defendants note that the IU Handbook includes disclaimer language that the handbook does not create a contract. Specifically, on the front page of the IU Handbook, it states that "[s]tatements and policies in this *Handbook* do not create a contract and do not create any legal rights". (Filing No. 110-11 at 1.) Such language is sufficient, by itself, to prevent Grant's promissory estoppel claim. *See Workman v. United Parcel Serv., Inc.*, 234 F.3d 998, 1000 (7th Cir. 2000).

Potentially recognizing this roadblock, Grant argues that IUSB's failure to follow the procedures permitted the Defendants to retaliate against him for making complaints against the Faculty Board of Review.   However, Grant neither explains this assertion nor supports it with evidence in the record.  As a result, the Court need not consider it further.  *See Wehrs v. Wells*, 688 F.3d 886, 891 n.2 (7th Cir. 2012) (unsupported and undeveloped arguments are waived); *Curtis v. Earnest Mach. Prods*. Co., No. 1:11-CV-0951-TAB-JMS, 2012 WL 5879439, at *4 (S.D. Ind. Nov. 20, 2012).  Accordingly, summary judgment is warranted on this claim as well.

**I       Claims 16, 17, and 18: Defamation**

Grant has not presented sufficient facts or argument to establish his defamation claims.  To begin, Grant did not present any evidence or argument in support of his state law defamation claims.  Accordingly, summary judgment is warranted for claims 16 and 18.

Regarding his federal defamation claim, Grant cites several *South Bend Tribune* articles, published shortly after Guillaume's investigation of student complaints, on September 21, 2008. (Filing No. 119-23.)  However, Grant does not identify which specific statements he claims are defamatory.  *Harney*, 526 F.3d at 1104 ("[i]t is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which [it] relies.").  The Court's review of the documents suggest that the Defendants were, instead, tight-lipped about the investigation of the student's complaints and the sanctions imposed upon Grant.  Indeed, the articles frequently cite frustrations by students and the press that IUSB did not publically reveal the sanctions against Grant.  (*See, e.g*., Filing No. 119-23 at 1-2.)

More importantly, Grant has not shown that any statement made by the Defendants was false, a necessary element of his defamation claim.  *See Trail v. Boys and Girls Clubs of Nw. Ind.*,

845 N.E.2d 130, 136 (Ind. 2006) ("[a]ny statement actionable for defamation must not only be defamatory in nature, but false."). Instead, Grant merely cites to the articles and hopes the Court will identify the allegedly defamatory statements and then sort out the true statements from the false ones. This, the Court will not do. *See Harney*, 526 F.3d at 1104.

In addition, Grant argues, without factual support, that Guillaume admitted that he had told the media that Grant had been sanctioned, even though Grant was not suspended, demoted or terminated. However, even if such a statement was made to the media, Grant has provided no facts to suggest that the statement was false. In contrast, the Defendants have submitted evidence that Grant was indeed sanctioned. (*See* Filing No. 110-6 at 3; Filing No. 111-3.)

Finally, under § 1983, Grant must show that: (1) he was stigmatized by the Defendants' conduct; (2) the stigmatizing information was publically disclosed; and (3) he suffered a tangible loss of other employment opportunities as a result of public disclosure. *Townsend v. Vallas*, 256 F.3d 661, 669-70 (7th Cir. 2001). Grant has identified no facts to suggest that he has been unable to find other employment opportunities because of allegedly false statements made in the articles identified. *See Id*. at 670 (noting that a plaintiff employee must establish that the allegedly defamatory statement made it "virtually impossible for the employee to find new employment in his chosen field"). Accordingly, summary judgment is warranted on this claim as well.

**J.      Claims 19 and 20:  Intentional and Negligent Infliction of Emotional Distress**

Grant has presented insufficient facts or argument to establish his intentional and negligent infliction of emotional distress claims. To establish a claim of negligent infliction of emotional distress, a plaintiff must show that a defendant engaged in extreme and outrageous conduct that intentionally or Chancellor Recklessly caused severe emotional distress to another. *Bradley v. Hall*, 720 N.E.2d 747, 752 (Ind. Ct. App. 1999). Defendants argue that the actions of investigating and terminating Grant pursuant to the appropriate disciplinary process does not "exceed all

possible bounds of decency." *See Powdertech, Inc. v. Joganic*, 776 N.E.2d 1251, 1264 (Ind. Ct. App. 2002) ("firing [an employee] pursuant to [a] disciplinary policy does not constitute extreme and outrageous conduct").

In addition, the Court notes that Grant did not respond with any facts to support these claims. Instead, he made the following unsupported assertion:

> Defendants' actions shocks the conscience, were outrageous and were without just cause or excuse, and was done intentionally or Chancellor Recklessly with malice, oppression and fraud for the sole purpose of revenge, to influence the decisions of [Mr. Grant's] colleagues, the community and to cause permanent harm to [Grant's] reputation and ability to secure employment and to cause [Grant] distress and aggravation due to Defendants' ill will and hatred towards [Grant].

(Filing No. 118 at 35.) These sorts of broad and unsupported assertions are insufficient even at the pleadings stage, let alone at summary judgment. As such, without facts to support these assertions, Grant has failed to demonstrate that he can support these claims. Accordingly, summary judgment is warranted.

## K.   Claim 21:  Violation of Ind. Code § 21-39-2-4(b)

Grant's claim under Ind. Code § 21-39-2-4(b) cannot proceed because the statute does not provide a private right of relief. Indiana Code § 21-39-2-4(b) provides that –

> [t]he board of trustees of a state educational institution may dismiss, suspend, or otherwise punish any student, faculty member, or employee of the state educational institution who violates the institution's rules or standards of conduct, after determination of guilt by lawful proceedings." Grant argues that he is entitled to relief under this statute because the Defendants did not apply the proper procedures to determine his "guilt.

Grant's argument is unavailing because the statute expresses no intent to confer a private right of action on public employees and includes no remedy for private enforcement. See *City of Muncie v. Peters*, 709 N.E.2d 50, 56-57 (Ind. Ct. App. 1999) (holding that an indemnity statute did not create private right of action for the same reasons); see also *Nat'l R.R. Passenger Corp. v.*

*Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 465-66 (1985) ("[a]bsent some clear indication that the legislature intends to bind itself contractually, the presumption is that a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise").  As a result, Grant may not proceed on this claim, and summary judgment is warranted.

**L.      Claims 22 and 23: Fraud**

Grant did not present any evidence or argument in support of his fraud claims.  To establish actual fraud, a plaintiff must show: (1) a material misrepresentation of past or existing fact; (2) made with knowledge of or Chancellor Reckless disregard for the falsity of the statement; and (3) the  misrepresentation is relied upon to the detriment of the relying party.  *See Schott v. Huntington Natl. Bank*, 914 F. Supp. 2d 933, 941 (S.D. Ind. 2012) (citing *Colonial Penn Ins. Co. v. Guzorek*, 690 N.E.2d 664, 675 (Ind. 1997).  To establish constructive fraud, a plaintiff must show: (1) a  duty  owing by the party to be charged to the complaining party due to their special relationship; (2) a violation of that duty by the making of deceptive  material misrepresentations of past or existing facts or remaining silent when a duty to speak exists; (3) the reliance thereon by the complaining party; (4) an injury to the complaining party as a proximate result thereof; and (5) the gaining of  an advantage by the party to be charged at the expense of the complaining party. *Am. Heritage Banco, Inc. v. Cranston*, 928 N.E.2d 239, 246 (Ind. 2010).  Having failed to submit any evidence or argument to establish these elements, the Court can only assume that Grant has abandoned these claims.  As a result, summary judgment is warranted for these claims as well.

**M.**   **Claims 24, 25, and 26: Breach of Contract**

Finally, Grant cannot establish a breach of contract claim.  Grant alleges the Defendants breached a contract by failing to follow the provisions of the IU Handbook.  However, the IU Handbook does not create a contractual right to any particular procedures.

To begin, on the front page of the IU Handbook, it states that "[s]tatements and policies in this *Handbook* do not create a contract and do not create any legal rights".  (Filing No. 110-11 at 1.)  In addition, the IU Handbook also states that it is subject to the "limitation imposed by the laws of the State of Indiana, the Board of Trustees of Indiana University, and by the Indiana University Faculty Constitution".  (Filing No. 119-1 at 7.)  The Seventh Circuit has held that such disclaimer language "is a complete defense to a suit for breach of contract based on an employee handbook." *Workman*, 234 F.3d at 1000.  Further, Indiana courts and courts within the Seventh Circuit have both concluded that the IU Handbook is not an enforceable contract.  *See Lim*, 2001 WL 1912634, at *19-20 (IU Handbook); *Hayes v. Trs. of Ind. Univ.*, 902 N.E.2d 303, 313 (Ind. Ct. App. 2009) (IUPUI Human Resources Manual).

In addition,  even if  the Court considered the procedures in the IU Handbook to be part of an enforceable contract, which it does not, the undisputed evidence establishes that the Defendants at least substantially complied with the relevant procedures, particularly given the gravity of the allegations against Grant and his failure to submit sufficient evidence to contradict those allegations at any point in the process.  *See Park v. Ind. Univ. Sch. of Dentistry*, 692 F.3d 828, 831 (7th Cir. 2012) ("Indiana courts have quite properly exercised the utmost restraint in applying traditional legal rules to disputes within the academic community, . . . noting that literal adherence to internal rules will not be required where the dismissal rests upon expert  judgments as to academic  or  professional  standards") (internal citation and punctuation omitted); *Neel v. Ind.*

28

*Univ. Bd. of Trs.*, 435 N.E.2d 607, 612-13 (Ind. Ct. App. 1982) (upholding a student dismissal based on the university's "substantial compliance" with academic procedures, noting that a university's policies were "not an integrated agreement").

Finally, as already discussed, Grant has also failed to submit any evidence to suggest that the Defendants were motivated by a racial animus, which is necessary to support his breach of contract claim under 42 U.S.C. § 1981(b). *See Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) ("[s]ection 1981 offers relief . . . when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship."). For these reasons, summary judgment is also warranted for all of Grant's breach of contract claims.

## IV.  CONCLUSION

For the reasons stated above, the Court **GRANTS** the Defendants' Motion for Summary Judgment with regards to Grant's remaining claims.  (Filing No. 108.)

The Court will enter final judgment by separate order.


**SO ORDERED.**


Date: 3/28/2016

_____
TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana


DISTRIBUTION:

Damon R. Leichty
BARNES & THORNBURG - South Bend
damon.leichty@btlaw.com

R. Anthony Prather
BARNES & THORNBURG LLP (Indianapolis)
tony.prather@btlaw.com

R. Holtzman Hedrick
BARNES & THORNBURG LLP (Indianapolis)
holt.hedrick@btlaw.com

Alex Maurice Beeman
CIOBANU LAW PC
abeeman@ciobanulaw.com

Andrea Lynn Ciobanu
CIOBANU LAW, PC
aciobanu@ciobanulaw.com